MERRITT, J., delivered the opinion of the court in which, DONALD, J., joined. CLAY, J. (pp. 714-18), delivered a separate dissenting opinion.
OPINION
MERRITT, Circuit Judge.
Defendant Abel Martinez Tavera was convicted by a jury and sentenced to 186 months of imprisonment for participating in a methamphetamine drag conspiracy. With Tavera as his passenger, co-defendant Placido Mendoza drove a truck for several hours from North Carolina to Tennessee. The track contained construction equipment and a large quantity of methamphetamine hidden under nails. The police arrested both men after discovering the drags. At his trial, Tavera, a roofer, testified that he did not know about the drugs and that he thought he was going to Tennessee to view a construction project. After his conviction, Tavera learned that a few days before his trial Mendoza had participated in plea negotiations in which he told Assistant U.S. Attorney Donald Taylor, the government’s trial lawyer in Tavera’s case, that Tavera had no knowledge of the drag conspiracy. Mendoza pled guilty after the negotiations.
*708 Mendoza’s statements to Taylor were plainly exculpatory. They not only corroborated Tavera’s trial testimony — they directly contradicted the story of the government’s main witness, co-defendant Guadalupe Granado, who testified that Tavera had detailed knowledge of the drugs in the truck and participated in the conspiracy. However, the jury never learned of Mendoza’s statements because Taylor, the prosecutor, failed to disclose them to Tav-era. Tavera was in jail. He did not communicate with or presumably did not have access to Mendoza. His lawyer did not interview Mendoza.
Fifty years ago, the Supreme Court held in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that the government must provide defendants with material, exculpatory evidence in its possession. Failure to do so results in a trial that is fundamentally unfair. The Supreme Court has never wavered from this principle. Yet nondisclosure of Brady material is still a perennial problem, as multiple scholarly accounts attest.[1] This case shows once again how prosecutors substitute their own judgment of the defendant’s guilt for that of the jury. So long as favorable evidence could very well affect the jury’s decision, prosecutors must disclose it. And when they fail to do so, courts have a duty to order a retrial, allowing a jury to consider the previously concealed evidence.
This particular case is not close. Prosecutor Taylor’s failure to disclose Mendoza’s statements resulted in a due process violation. We therefore vacate Tavera’s eonviction and remand for a new trial. In addition, we recommend that the U.S. Attorney’s office for the Eastern District of Tennessee conduct an investigation of why this prosecutorial error occurred and make sure that such Brady violations do not continue.
I. Background
In May 2010, Tavera was arrested with four co-defendants during an undercover sting in the area of Morristown, Tennessee. The sting was the product of an investigation in which Agent Michael Tem-pleton of the Drug Enforcement Administration posed as a dealer interested in acquiring a large quantity of marijuana or methamphetamine. Agent Templeton’s main contact was Guadalupe Granado. Templeton bought small quantities of meth from Granado on several occasions and arranged to purchase ten pounds of the drug on May 14, 2010. Originally the plan was for Templeton to conduct the transaction in a McDonald’s parking lot with unknown associates of Granado. This arrangement fell through at the last minute because Granado insisted that the meeting be changed to a more remote location. However, surveillance enabled law enforcement to track and arrest the participants as they were driving away from the planned location of the buy.
Police first arrested Elias Perez, Placido Mendoza, and Tavera. Perez was driving a red Chevy Cavalier. A search of the car uncovered a firearm and ammunition inside a cooler. Mendoza was driving a red *709 Dodge Ram pickup truck in which Tavera was the passenger. The truck contained a variety of construction equipment, including a ladder and a bucket of nails. Underneath the nails police discovered a large quantity of methamphetamine. As it later emerged, Mendoza and Tavera had driven with the drugs from Winston-Salem, North Carolina, that same day. Perez, who had been staying in Tennessee, had been assigned to drive the Cavalier as a lookout. Later in the day police arrested Granado and Marco Rivera, who turned out to be the source of the drugs.
The government indicted all five men. It charged Tavera with one count of conspiracy to distribute over 500 grams of methamphetamine and one count of possession with intent to distribute over 500 grams of methamphetamine.[2] All participants except Tavera pled guilty.
Tavera’s trial was held on May 3-6, 2011. Granado’s testimony was the primary proof against Tavera. Granado testified that he had previously been to Tav-era’s home in North Carolina and that Tavera was present while Rivera cooked meth. He testified to overhearing a phone conversation between Rivera and Mendoza in which Rivera suggested that Mendoza bring Tavera for security and to count money from the transaction. He testified that Tavera was to be paid for helping with the drugs and that there was no construction job. And he testified to post-arrest conversations he had with Tavera in jail. In these conversations, Tavera stated that he wished to remove meth-related materials from his home, asked Granado to tell law enforcement that he had never seen Tavera before, and revealed that he had used the ladder to make it look like he and Mendoza were traveling for construction work.
In addition to Granado’s testimony, the government introduced physical evidence recovered from the truck and evidence of phone calls exchanged between the participants in the hours before the arrest. There were multiple calls from Rivera to Mendoza, but not Tavera, during the time that Mendoza and Tavera were driving from North Carolina. Additionally, Tav-era had talked on the phone with both Rivera and Mendoza in the weeks before the sting.
Tavera’s primary proof was his own testimony. He testified, contrary to Grana-do’s story, that he and Granado had never met before the sting and that he never attempted to get Granado to lie. He established his long career as a roofer and stated that he knew Mendoza and Rivera through legitimate construction work. He testified that he believed the purpose of the trip was to provide an estimate on a roofing job and that he brought the ladder for that reason. When he and Mendoza arrived at the site of the drug transaction, Tavera said, he began to get “desperate about where the job was going to be,” and Mendoza responded that they were waiting for someone to take them there. On cross-examination, Tavera said he did not know the exact location of the job beforehand. He also admitted that Mendoza talked with Rivera on the phone during the trip, but he contended that he did not hear the substance of the conversations. In addition to this evidence, the parties stipulated that ion swabs showed methamphetamine on Mendoza’s hands and cell phone, on the cooler where the firearm *710 was found, and in Granado’s car, but not on Tavera’s hands or cell phone.
The jury found Tavera guilty on all counts, and on September 12, 2011, the court sentenced him to 15 years and 6 months of imprisonment. The court held a sentencing hearing for Mendoza on the same day. At his hearing, Mendoza argued that he was “safety-valve” eligible for a reduced sentence because he had provided truthful information to the government about the crime. In the week before Tav-era’s trial, Mendoza had participated in two debriefings with Mr. Taylor, the Assistant U.S. Attorney, and agents involved in the sting. At the first debriefing, Mendoza told Taylor and the agents that Tavera was not involved in the conspiracy and did not know there were drugs in the truck. Later the same day, there was a second debriefing at which Mendoza said Tavera “did know about the drugs that were in the vehicle, but did not know until he got in the vehicle with [Mendoza] that day.” R. 213, Mendoza Sentencing Tr. at 15. Throughout these debriefings, Mendoza denied that the defendant came along to count money or provide security. He consistently maintained that the roofing job was one of the purposes of the trip to Tennessee.
The government never disclosed Mendoza’s statements to Tavera. After the debriefings, Mendoza signed a plea agreement. Mendoza’s agreement reversed his position that Tavera was innocent and stated, “Tavera knew that they were transporting methamphetamine from North Carolina to be delivered to another person in Tennessee and agreed to accompany [Mendoza]. Since they were transporting methamphetamine, Tavera told [Mendoza] that they needed to be careful.” R. 143, Am. Plea Agreement at 6. Obviously, Mendoza was lying either in the beginning or after his plea negotiations.
Tavera filed a timely notice of appeal from the district court’s final judgment, thus vesting this court with jurisdiction. One year later, Tavera filed his brief in this court as well as a motion for a new trial in the district court. Both are based on the argument that Brady required disclosure of Mendoza’s statements at the debriefings. The district court has not yet ruled on the new-trial motion. Ordinarily we would provide the district court an opportunity to consider the motion before we do. However, because Brady claims ultimately present a question of law reviewed de novo, see United States v. Tarwater, 308 F.3d 494, 515 (6th Cir.2002), and because Tavera and the government agree that the factual record is fully developed, we proceed to decide the issue.
II. Brady
Fundamental guarantees of due process require the government to provide defendants with evidence it possesses that is exculpatory and material to the defense. This has been a cardinal rule of criminal procedure since Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Under contemporary doctrine, there is a Brady violation, and a new trial is warranted, if three conditions are met: “The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.” Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (emphasis added). Brady itself was a case like this one in which the prosecution failed to disclose a statement by a co-defendant that Brady did not shoot the victim. Apparently, neither Brady nor his counsel had attempted to interview the witness. Here, we must consider whether the gov *711 ernment suppressed Mendoza’s statements and, if so, whether those statements were material to Tavera’s defense so that the suppression prejudiced him.[3]
A. Suppression
In defense of its failure to disclose Mendoza’s statements, the government argues, and the dissent agrees, that Tavera (although confined to his prison cell) or his lawyer should have exercised “due diligence” and discovered the statements by asking Mendoza if he had talked to the prosecutor. This “due diligence” defense places the burden of discovering exculpatory information on the defendant and releases the prosecutor from the duty of disclosure. It relieves the government of its Brady obligations. In its latest case on the issue, however, the Supreme Court rebuked the Court of Appeals for relying on such a due diligence requirement to undermine the Brady rule.
In Banks v. Dretke, 540 U.S. 668, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004), the Court considered the Fifth Circuit’s use of a due diligence requirement to dismiss the defendant’s Brady claim. As in this case, the diligence question in Banks was whether the defendant “should have asked to interview” a witness who could have furnished the exculpatory evidence the prosecutor did not disclose. Banks, 540 U.S. at 688, 124 S.Ct. 1256. The Supreme Court rejected this requirement in no uncertain terms at page 696, 124 S.Ct. 1256:
The State here nevertheless urges, in effect, that “the prosecution can lie and conceal and the prisoner still has the burden to ... discover the evidence,” Tr. of Oral Arg. 35, so long as the “potential existence” of a prosecutorial misconduct claim might have been detected, id., at 36. A rule thus declaring “prosecutor may hide, defendant must seek, ” is not tenable in a system constitutionally bound to accord defendants due process. “Ordinarily, we presume that public officials have properly discharged their official duties.” Bracy v. Gramley, 520 U.S. 899, 909 [117 S.Ct. 1793, 138 L.Ed.2d 97] (1997) (quoting United States v. Chemical Foundation, Inc., 272 U.S. 1, 14-15 [47 S.Ct. 1, 71 L.Ed. 131] (1926) (internal quotation marks omitted)). We have several times underscored the “special role played by the American prosecutor in the search for truth in criminal trials.” Strickler, 527 U.S., at 281 [119 S.Ct. 1936]; accord Kyles, 514 U.S. at 439-440 [115 S.Ct. 1555]; United States v. Bagley, 473 U.S. 667, 675, n. 6 [105 S.Ct. 3375, 87 L.Ed.2d 481] (1985); Berger, 295 U.S. at 88 [55 S.Ct. 629]. See also Olmstead v. United States, 277 U.S. 438, 484 [48 S.Ct. 564, 72 L.Ed. 944] (1928) (Brandeis, J., dissenting). Courts, litigants, and juries properly anticipate that “obligations [to refrain from improper methods to secure a conviction] ... plainly resting] upon the prosecuting attorney, will be faithfully observed.” Berger, 295 U.S. at 88 [55 S.Ct. 629]. Prosecutors’ dishonest conduct or unwarranted conceal *712 ment should attract no judicial approbation.
(Emphasis added). Prior to Banks, some courts, including the Sixth Circuit, as our dissenting colleague argues, were avoiding the Brady rule and favoring the prosecution with a broad defendant-due-diligence rule. But the clear holding in Banks should have ended that practice.[4]
The Supreme Court’s rejection of the idea that the “prisoner still has the burden to discover the evidence” is based in part on the fact that the prosecution has the advantage of a large staff of investigators, prosecutors and grand jurors, as well as new technology such as wiretaps of cell phones. That is one of the reasons that these investigators must assist the defendant who normally lacks this assistance and may wrongfully lose his liberty for years if the information they uncover remains undisclosed. The superior prosecu-torial investigatory apparatus must turn over exculpatory information. The Brady rule imposes an independent duty to act on the government, like the duty to notify the defendant of the charges against him.
The prosecutor and our dissenting colleague would fault Tavera’s lawyer for not finding out that Mendoza had at first told the prosecutor that Tavera was innocent before later changing his story in plea negotiations. But if the lawyer lost the benefit of Brady by his failure to “seek” (as the Supreme Court describes it in Banks), the lawyer most certainly then would have been guilty of ineffective assistance of counsel. According to the prosecution here, as the government argued in Banks, it was the lawyer’s responsibility to “discover this evidence.” If the prosecution and the dissent are right, we must punish the client who is in jail for his lawyer’s failure to carry out a duty no one knew the lawyer had. The Banks case makes it clear that the client does not lose the benefit of Brady when the lawyer fails to “detect” the favorable information.
Even with a broad diligence rule, it seems highly unlikely in this case that an adverse co-defendant like Mendoza, if interviewed, would have disclosed to Tavera that he had at first told the prosecutor that Tavera was innocent but changed his story during his plea negotiations. Mendoza’s lawyer would have told him that he would be admitting to a federal crime by admitting that he had lied to government agents either before or after the plea agreement. See 18 U.S.C. § 1001.
It is not unusual for prosecutors to receive exculpatory statements the defendant does not know about. This is the type of information Brady was designed to force into the open. See both Brady and Strickler, 527 U.S. at 282-89, 119 S.Ct. 1936 (rejecting due diligence argument where government failed to disclose prior statement inconsistent with witness’s trial testimony).
In sum, we follow the Supreme Court in Brady, Strickler, and the recent Banks case, and decline to adopt the due diligence rule that the government proposes based on earlier, erroneous cases.
B. Materiality
To determine whether nondisclosure of exculpatory evidence resulted in *713 an unfair trial, we assess whether the evidence was “material” to a defendant’s case. Evidence is material under Brady if there is a “reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). “Reasonable probability” is defined as “probability sufficient to undermine confidence in the outcome.” Id. The court must review the trial record and decide whether it remains confident that the outcome would be the same even if the jury heard the suppressed evidence. See Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (“The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.”). If consideration of the additional evidence shakes the court’s confidence in the verdict, a new trial should be ordered even if there remains sufficient evidence to sustain a conviction. See Strickler, 527 U.S. at 290, 119 S.Ct. 1936 (“[T]he materiality inquiry is not just a matter of determining whether ... the remaining evidence is sufficient to support the jury’s conclusions.”); United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (“[T]he omission must be evaluated in the context of the entire record.”).
Here, Tavera was convicted of conspiracy to distribute the methamphetamine as well as possessing it with intent to distribute. Liability for each crime requires a showing of intent. To establish conspiracy, the government must prove that the defendant knew the “essential object of the conspiracy” and that he was “a party to the general conspiratorial agreement.” United States v. Christian, 786 F.2d 203, 211 (6th Cir.1986). Where drugs are involved, the government must show “an agreement to violate drug laws,” “intent to join the conspiracy,” and “participation in the conspiracy.” United States v. Sliwo, 620 F.3d 630, 633 (6th Cir.2010). As for possession with intent to distribute, physical presence at the place where drugs are found is insufficient proof. The defendant must have “ownership, dominion, or control over the contraband itself or the premises or vehicle in which the contraband is concealed.” United States v. White, 932 F.2d 588, 589 (6th Cir.1991). Additionally, the government must show “intent [to distribute], as opposed to mere knowledge.” Id. at 590.
Having reviewed the trial record, we cannot be confident that the jury would have found these elements satisfied had it known of Mendoza’s statements. The government’s proof of Tavera’s intent to join the conspiracy and distribute the drugs was not overwhelming. The only direct evidence of intent was Granado’s testimony. This was problematic proof, to say the least. Granado had serious credibility issues, given his established history as a drug dealer and his personal incentive to help the prosecution. Of course, problematic evidence is not necessarily insufficient evidence, but sufficiency is not the question that Brady requires us to address. Had Tavera been able to bolster his own testimony with Mendoza’s statements, he would have added a significant amount of weight to his side of the scale. Mendoza was a felon, but, considering the circumstances in which his statements were given, a juror may have believed he was telling the truth at first rather than after he had negotiated a guilty plea with the government. When the suppressed evidence tends to prove that the defendant did not willingly assist in a drug deal, and when the only evidence showing otherwise *714 is the testimony of an indicted co-defendant, we cannot say with any confidence that the outcome of the trial would have been the same.
The government offers several reasons why Mendoza’s statements would not have changed the outcome of the trial. First, it asserts that Mendoza’s statements were both internally inconsistent (because Mendoza changed his story between the first and second debriefings) and inconsistent with Tavera’s trial testimony (because Tavera testified that they were traveling to “estimate” a roofing job and Mendoza told the government that they were traveling to “do” a roofing job). These discrepancies do not give us pause. While Mendoza indeed changed his story, he maintained that Tavera knew of no drugs before getting in the truck and had no role in providing security. And the distinction between estimating a roofing job and actually performing it is insignificant. Both men stated that they intended to do legitimate work in Tennessee.
Second, the government argues that other evidence corroborates Tavera’s guilt. This evidence includes Tavera?s own “largely incredible” testimony (namely his contention that he didn’t know the exact location of the roofing job and that he couldn’t hear Mendoza’s phone conversations in the truck); wiretaps in which Gra-nado referred to “his people” in North Carolina (where Tavera lived); the fact that Granado previously used the truck in which Tavera was arrested to conduct a drug transaction with Agent Templeton; and phone records, including Tavera’s previous calls with Mendoza and Rivera. However, none of this evidence goes to the ultimate issue of the defendant’s intent. The best proof — the phone calls — can be explained by Tavera’s testimony that he knew Mendoza and Rivera through legitimate activity. Moreover, the government fails to acknowledge other proof in Tav-era’s favor, namely, unlike Mendoza, he lacked methamphetamine traces on his hands and cell phone.
Finally, the government argues that Mendoza’s statements would have been impeached and disproved had Tavera introduced them. Specifically, the government could introduce a letter in the record in which Mendoza tried to convince Rivera to lie about the crime, as well as Mendoza’s plea agreement stipulating that Tavera “knew that they were transporting methamphetamine from North Carolina to be delivered to another person in Tennessee and agreed to accompany [Mendoza].” Though the latter piece of evidence is unfavorable to Tavera, it does not trump the statements that Mendoza provided at the debriefings. If faced with both Mendoza’s plea agreement and his statements to the government, a jury would have to determine which evidence deserves more weight in light of the “reasonable doubt” standard. We cannot be confident how they would have assessed either piece of evidence in light of the entire record. The government has no reasonable justification for withholding the Mendoza statements. We do not want other prosecutors to imitate the prosecutor’s conduct in this case. Brady and Banks do not require the defendant to discover such undisclosed statements laying in the prosecutor’s file.
Accordingly, the judgment of the district court is vacated and the case is remanded for further proceedings.

. See, e.g., Stephanos Bibas, Prosecutorial Regulation Versus Prosecutorial Accountability, 157 U. Pa. L.Rev. 959, 975-77 (2009) (concluding that prosecutors rarely receive professional discipline despite a high number of Brady violations); Bennett L. Gershman, Litigating Brady v. Maryland: Games Prosecutors Play, 57 Case W. Res. L.Rev. 531 (2007) (doc-lamenting strategies prosecutors use to avoid disclosing favorable evidence); James S. Liebman et al., Capital Attrition: Error Rates in Capital Cases, 1973-1995, 78 Tex. L.Rev. 1839, 1850 (2000) (reporting that Brady violations caused sixteen percent of capital-case reversals in state postconviction proceedings during period studied).

. The government also charged Tavera with aiding and abetting possession of the firearm found in the Cavalier driven by Perez. The jury found Tavera guilty of the charge, but the district court granted Tavera’s subsequent motion for judgment of acquittal. This charge is not at issue here.

. The government insists that Mendoza's statements are "at best, equally inculpatory and exculpatory.” Br. of the United States at 32. We cannot take this argument seriously. As we discuss in Part II.B below, the government must show more than the' defendant’s mere knowledge to establish liability for conspiracy or possession with intent to distribute. Mendoza may have changed his story, but he was consistent in saying to Taylor and the agents at the interviews that Tavera did not know there were drugs in the truck before he agreed to accompany Mendoza and that Tavera did not ride along to provide security. This information, if' believed, exculpates Tavera by showing his lack of willing involvement in the conspiracy or intent to distribute drugs.

. Our dissenting colleague argues that the Sixth Circuit has adopted the due diligence defense as a "gloss” but that we must apply it here anyway despite the Supreme Court’s opinion to the contrary in Banks. In Bell v. Bell, 512 F.3d 223, 235 (6th Cir.2008), the en banc court distinguished Banks on the ground that Bell involved "public sentencing records” rather than "information known to investigating officers that defendants had no reason to know about” — the situation in Tavera’s case. The instant case is not a "public records” case.